NOT DESIGNATED FOR PUBLICATION

No. 124,044

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of
JOHN R. JAMES.

MEMORANDUM OPINION

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed November 18, 2022. Affirmed.

*Joshua J. Boehm* and *David P. Troup*, of Weary Davis, L.C., of Junction City, for appellant Thomas James.

*Whitney L. Casement*, *Bradley R. Finkeldei*, and *Matthew Hoy*, of Stevens & Brand, L.L.P., of Topeka, and *Catherine C. Theisen*, of Barber Emerson, L.C., of Lawrence, for appellee Katherine James.

Before WARNER, P.J., GREEN and HILL, JJ.

PER CURIAM: Thomas James appeals from the trial court's ruling that he reached a valid settlement agreement with his sister Katherine James in the probate of their father's estate. At a hearing in 2020, counsel read a settlement into the record. A few days later, Thomas signed the agreement, making some handwritten notes in the margin and adding a two-page supplement. After the trial court ruled that the parties had a valid settlement agreement, Thomas appealed but did not move to stay probate proceedings. The trial court ordered a final distribution in 2021. Because we conclude that the trial court's ruling was right for the wrong reason, we affirm.

1

FACTS

John R. James died in March 2017 and his two children, Katherine and Thomas, have been in litigation ever since. When John died, he was subject to a guardian and conservatorship proceeding in Douglas County, and Katherine served as her father's conservator.

In April 2017, John's widow Barbara James filed a petition for probate of will requesting admittance of John's handwritten will. Stevens and Brand, LLP represented both Barbara and Katherine in this present matter and in the conservatorship proceedings. Since this action was filed in April 2017, five attorneys have represented Thomas and have been allowed to withdraw from the case.

In June 2017, the trial court appointed Barbara the executor of the estate and admitted John's will to probate. The estate's inventory totaled more than $13 million, the bulk of which was corporate stock, making it subject to substantial changes in value. Barbara filed two accountings showing the estate's expenses and the recorded dividend reinvestments and interest payments. In March 2018, Barbara petitioned for final settlement. Then Barbara died in May 2018.

Two days after Barbara died, Thomas petitioned the trial court to appoint him executor of the John James estate. Katherine also petitioned to be named executor and filed a written defense to Thomas' petition. The trial court appointed Katherine as temporary successor executor. Thomas then issued a series of subpoenas related to the estate's investment accounts. He sought account history, balances, ownership status, and records of beneficiary designations by sending business record subpoenas to U.S. Bancorp, Merrill Lynch, Baldwin State Bank, and other financial institutions. Katherine objected to all of Thomas' subpoenas.

In July 2018, Katherine asked to file an amended inventory and valuation with the trial court, explaining that some assets originally listed had a surviving joint owner and should not have been included in the original inventory of John's assets. In April 2019, Katherine added a supplement to the amended inventory. In the supplement, Baldwin State Bank corrected an ownership classification, explaining that John and Barbara owned the Baldwin State Bank account as tenants in common, not as joint tenants with right of survivorship. The supplement also added a certificate of deposit to the probate assets.

On September 23, 2020, counsel circulated an acknowledgement of settlement agreement. Katherine signed it that day.

On September 24, 2020, the trial court held a pretrial motions hearing to prepare for trial coming up on September 28. The parties instead told the trial court that they reached a resolution in the matter. Katherine's counsel advised the trial court that the parties had written out bullet points of agreement, stating that "these bullet points are intended to be more fully developed in a valid settlement agreement pursuant to K.S.A. 59-102(8)." Katherine's counsel read into the record the agreement that Katherine had signed. The trial court discussed with counsel a reasonable time frame to expect Thomas' signature and set the matter for a hearing on September 29, 2020.

Counsel for the parties believed that the agreement would be fully executed on Monday, September 28, 2020. But the matter was set for an evidentiary hearing that day. With some trepidation, the trial court canceled the hearing, cautioning the parties as follows:

> "Based on what I have heard today, I am making a finding that the parties have entered into a settlement agreement. It remains to be memorialized and in a written format and formally executed, but if I remove matters from the docket for Monday, these contested

matters, the parties are foregoing their opportunity to contest the issues that are set for Monday. And the only contest that would exist thereafter would be as to any nonmaterial terms to the agreement that's been announced here today."

On September 28, 2020, Thomas signed the agreement. At the hearing on September 29, 2020, counsel told the trial court that Thomas had signed the agreement but had made some handwritten edits. Next to paragraph seven of the agreement, Thomas wrote "security at [the address on 1400 Road] remains to be resolved" and either struck through or underlined part of paragraph seven. That language released Katherine and the estate from liability for personal property stored at that address. It is unclear whether Thomas meant to strikethrough or underline the language. Thomas' counsel told the trial court that this edit was not a material change.

The real property at the address on 1400 Road was not a probate asset and became Katherine's property after separate litigation. Neither the original language of the agreement nor Thomas' edit dealt with the real estate. Both writings addressed some of the personal property stored on the real estate. That personal property was to go to Thomas, but he was not yet able to retrieve it.

Thomas also altered language in paragraph four, related to the nonprobate asset of the Nicholas Fund investment account. He struck through the words "Barbara is the beneficiary" and handwrote "is distributed to Barbara." At paragraph 12, Thomas made a cosmetic change by striking through part of the phrase "Thomas also agrees he will not object" to make it read simply "Thomas will not object." At paragraph 13, Thomas underlined "the settlement." The trial court found that these handwritten notes made no material changes to the valid settlement agreement.

4

The trial court went on to discuss the fact that, despite the parties both signing a valid settlement agreement, they already disagreed as to interpretations of some language. In the trial court's own words, it stated:

"And on the more detailed issue that both counsel, all counsel have spoken to, as to the proper interpretation of [']Thomas will release Katherine,['] etcetera, as struck through in what's been presented to the Court and executed by Thomas James, I think what it boils down to is if that's a term that the Court needs to make a finding on at some future date as to what the parties' intent was, then we can have a hearing on that. But nothing I have heard today disturbs my prior finding that a material—that an agreement exists in all material terms. And as I said, or as I think I recall saying on the 24th, the only thing that could be a source of contention between the parties would be refining those terms or interpreting the intention of the parties with respect to any of those terms. And what I am hearing today sounds like falls within the scope of that finding by the Court. And so I don't believe there is a request before the Court today to resolve any dispute as to what the final terminology should be or what the final interpretation should be of that language.

"I take it that's the purpose of setting the hearing for October 22nd at 10:30, and if there needs to be some other requests prior to that time, but my finding stands that there is an agreement and the parties are duty bound to work in good faith towards reducing an agreement to a form that can be submitted to the Court as a valid settlement agreement, and I'm not sure there is more I can find today."

At the October 2020 hearing, Katherine explained to the trial court the progress made from the signed settlement agreement. Katherine used the "15 bullet points" of the settlement agreement to draft a "detailed distribution schedule outlining which particular assets would be liquidated to pay for fees, [and] how distribution of the various financial assets would occur." Thomas had not signed or offered revisions on this "more comprehensive settlement agreement." When the parties requested another hearing date, the trial court described what that hearing would address as follows:

5

"So again, thinking out loud, the issues would be, A, is any objection to the final settlement agreement a term that was fairly within the contemplation of what the Court has already found was announced by [Katherine's counsel], and then at the 24th—let me get my dates correct for the record—we were here on September 24th, the agreement was read into the record, and then on the 29th the Court was presented with a proffer of the acknowledgement of settlement that had been both marked on by presumably Mr. James, but ultimately signed by him, and then was not signed by Katherine because of a concern about whether she wanted to accept those edits.

"And so what we would be dealing with is first and foremost is any dispute beyond what's within the fair contemplation of the settlement agreement that was approved by the Court in concept. And then if it's within the scope of that, what did the parties intend to agree as I have heard it announced at the previous hearings."

The trial court further stated the following, "[W]e've decided there is an agreement, it's a question of, you know, putting it into terms that the parties can execute, and really I don't see what the other issues would be."

In November 2020, Katherine submitted a draft of a settlement which detailed the distribution of assets. The same day, Thomas' counsel moved to withdraw. The trial court held hearings on the withdrawal motion. The trial court recapped the status of the case, stating that "on September 29th the Court made a finding that the parties had a settlement agreement, and that any dispute as to the language of the final agreement would be left open for the Court to resolve." Thomas' counsel explained that the attorney-client relationship was not working in part because she did not include two additional pages that Thomas wanted attached to the signed settlement agreement as a supplement. The trial court allowed Thomas' counsel to withdraw and advised Thomas to secure new counsel while the trial court worked on its written ruling, allowing for the possibility that new counsel might file additional motions.

The trial court issued its journal entry and memorandum decision in January 2021. The trial court concluded that the Thomas Supplement was in "legal harmony" with the

6

valid settlement agreement, addressing the same topics and evincing the same essential understanding. The trial court found this:

> "The Settlement as read into the record and approved by the Court is and remains a binding valid settlement agreement regarding the issues addressed within its terms. The settlement removed from the docket all disputes as to the content of the final inventory in this estate. To the extent the agreement restricts or prohibits any objections or actions as to final settlement, those terms will be binding on the parties.
> "Further, the Court finds that this conclusion is so self-evident from the language of the instruments that the parties are relying upon to dispute the existence of a settlement agreement that taking evidence would add no material value to the Court's ability to properly resolve the dispute."

Thomas, through new counsel, moved for reconsideration, claiming for the first time that he signed the settlement agreement under threat of violence. At an evidentiary hearing, Thomas testified that his counsel told him on September 28, 2020, that there would be violence against Thomas and his counsel if Thomas did not sign the agreement. Thomas could not elaborate on what kind of violence was threatened and could not remember the details of any threat of violence. Two months after Thomas signed the agreement, his counsel e-mailed him explaining the following: "'I am really sorry that I thought you understood my message of 1:30 about what the Acknowledgement represented. I am truly sorry that you somehow thought there was a threat of violence involved.'" After the evidentiary hearing, the trial court found that Thomas failed to present sufficient evidence to support his claim of duress, noting that several previous hearings had given Thomas multiple opportunities to raise allegations of duress earlier. The trial court reiterated its earlier finding that a valid settlement agreement existed.

Thomas appealed the ruling the next day, which is the appeal currently before us. The record contains no motion from Thomas for a stay of probate proceedings pending

this appeal. The trial court proceeded with a hearing on Katherine's petition for final settlement.

At the hearing, Thomas told the trial court that the pending appeal had no effect on the proceedings, that he had not filed a motion for stay, and that the trial court could continue to final settlement. Thomas objected to Katherine's executor fees, despite previously agreeing that he would not object. Thomas also objected to Katherine's petition for final settlement but neglected to raise the issue presented here—that no valid settlement agreement existed. After the hearing, the trial court issued orders on distribution of the probate assets. The record contains no notice of appeal from the trial court's final distribution orders.

ANALYSIS

*Did the trial court err by finding that there was a valid settlement agreement?*

Thomas argues that the trial court erred by finding that the parties had a valid settlement agreement on September 24, 2020. He notes that he had not signed it on that day, and he argues that the agreement does not show a meeting of the minds on all material terms. Katherine argues that the trial court correctly found that the parties had a valid settlement agreement when Thomas signed it on September 28, 2020. She argues that the parties agreed to all material terms.

"The interpretation and legal effect of written instruments are matters of law over which our review is unlimited." *Schmitendorf v. Taylor*, 58 Kan. App. 2d 292, 301, 468 P.3d 796 (2020) (citing *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 [2016]; *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 [2014]). "The primary rule in interpreting written contracts is to ascertain the intent of the parties. If the terms of the contract are clear, there is no room for rules of construction,

8

and the intent of the parties is determined from the contract itself." *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002).

Normally, whether a contract exists is a question of fact. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). An appellate court reviews a trial court's finding that a contract exists for substantial competent evidence. *Price v. Grimes*, 234 Kan. 898, 904, 677 P.2d 969 (1984); *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 407, 870 P.2d 686 (1994).

K.S.A. 59-102(8) defines a valid settlement agreement as "a written and acknowledged instrument which affects the administration or distribution of the estate and which is entered into by all interested heirs, devisees, legatees and persons whose interests are affected by the settlement agreement, all of whom must be competent or authorized to enter into such agreement." Contract law governs the enforcement and interpretation of valid settlement agreements. *Schmitendorf*, 58 Kan. App. 2d at 302.

K.S.A. 2021 Supp. 59-2249 permits the trial court to distribute an estate under a will, the laws of intestate succession, or a valid settlement agreement. "The only reasonable construction of these provisions, read together, is that the Kansas Legislature intended all family settlement agreements to be in writing." *In re Estate of Leathers*, 19 Kan. App. 2d 803, 804, 876 P.2d 619 (1994).

Katherine advances our inquiry on whether the trial court erred in finding that a valid settlement agreement occurred on September 24, 2020, by citing *In re Estate of Doffing v. House*, No. 95,911, 2007 WL 3341742 (Kan. App. 2007) (unpublished opinion). Thomas also cites *Doffing* to argue against its application, stating that it is an unpublished opinion and that our Legislature has not amended K.S.A. 59-102(8) to conform to its holding. But we conclude that *Doffing* is more like *Rector v. Tatham*, 287 Kan. 230, 196 P.3d 364 (2008), than it is to this case. A comparison, however, between

9

the *Rector* and *Doffing* cases helps to vividly illustrate the legal principles in *Rector* and *Doffing* are not warranted in this appeal.

For example, Mary Rector had ongoing disputes with her brother and two sisters in competing actions for guardianship and conservatorship of their mother. The siblings signed a handwritten agreement which specified, among other things, that Rector would buy their mother's home from their mother. If Rector could not raise the needed funds, then the home would be sold, and the money used for the mother's benefit. The agreement also stated that if the mother died, the remaining balance of the conservatorship would be payable to Rector. But when the mother died, $50,000 remained in the conservatorship and it was distributed evenly among the siblings per their mother's will.

Rector sued, alleging entitlement to the amounts distributed to her siblings. The siblings defended by arguing that K.S.A. 59-2249(a) permitted only three ways to distribute a decedent's estate: by will, by intestate succession, or by valid K.S.A. 59-102(8) settlement agreement. And in the siblings' view, the handwritten agreement did not meet the statutory requirements of a K.S.A. 59-102(8) settlement agreement. The siblings cited the plain language of K.S.A. 59-102(8) and *Leathers*, which held that a settlement agreement is not valid until it is written and signed by all parties. The siblings noted that the agreement Rector sought to enforce was not signed and acknowledged by all parties, failing to meet the K.S.A. 59-102(8) requirements. Nevertheless, the *Rector* court pointed out a factual distinction that Rector was making between her case and the *Leathers* holding:

> "The first problem with this argument is that it misses the point of Rector's petition and ignores a pivotal factual distinction between this case and *Leathers*. Rector does not assert that the agreement signed by herself and two of her siblings on January 31, 2003, is a valid family settlement agreement under K.S.A. 59-102(8); she

10

does assert that it is *an enforceable contract independent of its probate context*. And, unlike the agreement at issue in *Leathers*, the agreement before us here was not entered into after the death of the testator; it was entered into months before the parties' mother died. Rector may sue for what she regards as a breach of contract, specifically, the defendants' failure to abide by their assignment of their expectancy interests, as long as such a cause of action is viable in Kansas." (Emphasis added.) *Rector*, 287 Kan. at 233-34.

The *Rector* court determined that Rector could pursue a breach of contract claim against her siblings. The disputed agreement did not fall under the probate code and did not need to meet the requirements of K.S.A. 59-102(8). Thus, the trial court had erred in ruling that the agreement failed the K.S.A. 59-102(8) requirements because K.S.A. 59-102(8) simply did not apply to the cause of action.

This court in *In re Estate of Doffing* was less explicit than the *Rector* court. For example, unlike the *Rector* court, the *Doffing* court did not state that it was dealing with "an enforceable contract independent of its probate context." *Rector*, 287 Kan. at 234. But the facts of *Doffing* are similar.

Some of Clement Doffing's assets were within his probate estate; the rest were in two individual retirement accounts (IRAs). Before his death, Doffing distributed assets to five of his seven children as an advance against later distribution upon his death. After his death, all parties approved a settlement agreement whereby the pre-death distributions were credited against post-death distributions. But the flaw in the settlement agreement was that it did not specify whether the credits and offsets would come out of the probate assets, the IRAs, or some combination.

Jo Ann House, as executor, filed the will for probate of Doffing's estate. Five of the children filed written defenses to the probate action. But those same five children also filed suit against the other two children and the corporate holders of the IRAs, seeking to

11

prevent distribution of assets until all the claims were resolved. The trial court consolidated the probate action with the civil lawsuit.

Attorney Monte Vines made a settlement offer on behalf of all defendants (Vines letter). Generally, the agreement provided that the children who received an advance from Doffing while he was alive would receive a lower contribution after his death, with an attached spreadsheet. Plaintiffs' counsel accepted the defendants' offer and began drafting a family settlement agreement. Plaintiffs' counsel realized that the Vines letter did not specify where the deductions would come from—whether the children receiving less would receive less in probate assets or would receive less from the IRAs.

In *In re Estate of Doffing*, the Vines letter and accompanying spreadsheet showed that some children already received advances and showed an agreement that those children would now receive less. But the Vines letter was incomplete because it did not show where to make those deductions.

Here, the 15-point acknowledgment of settlement also provides broad strokes for dividing assets but without specifying, for example, which assets would be liquidated before distribution. And the trial court found a valid settlement agreement was executed on September 24, 2020, before Thomas had signed the settlement agreement. In *Doffing*, plaintiffs' counsel accepted the Vines letter, but the parties did not sign it. For this reason, Katherine argues that we should arrive at the same conclusion as the *Doffing* court and hold that there is a valid settlement agreement.

So, Katherine contends that the parties agreed to all material terms and thus have a valid settlement agreement under *In re Estate of Doffing*. Thomas argues, however, that we should instead apply the rule from the published *Leathers* decision requiring a signed writing rather than the unpublished *Doffing* exception. But the holding in *Rector* of "an

enforceable contract independent of its probate context" helps explain why *Doffing* will not bear the weight of reliance that Katherine places on it.

The *Doffing* court addressed the signed writing requirement of K.S.A. 59-102(8) from *Leathers* as follows:

> "Jo Ann argued that based on *Leathers*, the [trial] court had no choice but to distribute the probate estate equally because the parties had not individually signed the Vines letter or any document containing its terms. The district court said that Jo Ann's 'interpretation may be more sweeping tha[n] the Court of Appeals intended,' but it chose to distribute the probate estate equally, *thus leaving no possible violation of the* Leathers *rule*. The district court then ordered that the IRAs be distributed after making the adjustments agreed to in the Vines letter." (Emphasis added.) *In re Estate of Doffing*, 2007 WL 3341742, at *3.

In short, the trial court in *Doffing* completely sidestepped the K.S.A. 59-102(8) requirement for a valid settlement agreement under the probate code. The plaintiffs in *Doffing* proposed equaling out the advances some children had received by unequal distribution of probate assets, for tax purposes. But the trial court could not distribute probate assets that way without a valid settlement agreement signed by the parties. So, the trial court distributed the probate estate equally. But the IRAs were the subject of a civil dispute, brought in by consolidating the civil and probate cases. On appeal, the *Doffing* court did not analyze whether the parties had entered into a valid settlement agreement under K.S.A. 59-102(8), but instead applied general contract principles to their agreement about the IRAs. Seemingly, the *Doffing* court did the same thing as the *Rector* court and analyzed whether the parties had "an enforceable contract independent of its probate context." Thus, Katherine's and Thomas' reliance on *Doffing* will not resolve the issue in this appeal.

13

On the other hand, Kansas law favors the settlement of legal disputes. Absent bad faith or fraud, litigants who agree to resolve disputes may not subsequently repudiate their agreements. *In re Estate of Thompson*, 226 Kan. 437, 440, 601 P.2d 1105 (1979); see *James Colborn Revocable Trust v. Hummon Corp.*, 55 Kan. App. 2d 120, 128, 408 P.3d 987 (2017). In interpreting settlement agreements, it is important to remember that "'[t]he law favors settlement of disputes'" over prolonged litigation. *O'Neill v. Herrington*, 49 Kan. App. 2d 896, 903, 317 P.3d 139 (2014).

Indeed, our Supreme Court declared this: "[F]amily settlement agreements are favorites of the law and when fairly made, are to be given liberal interpretation and should not be disturbed by those who entered into them or by those claiming under or through them." *In re Estate of Thompson*, 226 Kan. at 441; *Cassity-Hauck v. Hauck*, No. 120,022, 2019 WL 1497083, at *5 (Kan. App. 2019) (unpublished opinion). "Hindsight, buyer's remorse, or other after-the-fact impulses cannot invalidate a settlement." *Schmitendorf*, 58 Kan. App. 2d at 305.

Our Supreme Court has found that family settlement agreements are favored because they prevent litigation between heirs "which is so often wasteful and which engenders such bitter feeling between people who should have a tender regard for each other. The desire that family harmony should not be destroyed by an unequal distribution [of assets] has been held sufficient consideration to support a family settlement." *Mills v. Purdy*, 142 Kan. 133, 135-36, 45 P.2d 1049 (1935).

Unlike *Rector* and *In re Estate of Doffing*, Katherine's and Thomas' dispute revolves around whether the trial court correctly determined that a valid settlement agreement had been executed by the parties under K.S.A. 59-102(8). The trial court's journal entry declares: "There is no question, then, that the Court found that a valid settlement agreement existed as of September 24, 2020." But Thomas had yet to sign the agreement on September 24, 2020. So, the trial court's finding is obviously wrong

14

because K.S.A. 59-102(8) requires "a written and acknowledged instrument" signed by all interested parties. Indeed, the *Leathers* court established that an acknowledged instrument is one signed by all parties. 19 Kan. App. 2d at 804. Nevertheless, if a trial court reaches the correct result, albeit for the wrong reason, the trial court's decision will be upheld even though it relied on the wrong ground or assigned erroneous reasons for its decision. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015).

Obviously, the requirements for a valid settlement agreement had yet to be fully performed on September 24, 2020; that is, one party or both parties to the settlement agreement had something yet to perform. Here, although Katherine had already signed the settlement agreement, Thomas had yet to sign the settlement agreement on September 24, 2020. Thus, the settlement agreement was partially executory as to Thomas but executed as to Katherine. *Wagstaff v. Peters*, 203 Kan. 108, Syl. ¶ 2, 453 P.2d 120 (1969) ("An executory contract is one the obligation of which relates to the future. A contract may be partly executed and partly executory.").

The trial judge explicitly acknowledged this lack of performance on Thomas' part at the September 24, 2020 hearing when he stated: "It [a settlement agreement] remains to be memorialized and in a written format and formally executed." Then, the trial judge explained that he was removing from his docket the September 28, 2020 contested hearing matter, revolving around the remaining material terms of the settlement agreement, because he determined that both parties had assented to all the material terms for a valid settlement agreement during the September 24, 2020 hearing. After this determination, the trial judge stated this: "And the only contest that would exist thereafter would be as to any nonmaterial terms to the agreement that's been announced here today." Based on the trial judge's quoted language, he concluded that the parties had agreed to all the essential material terms of the settlement agreement. And so, the only remaining thing that needed to be done was Thomas' execution of the settlement agreement.

15

Thus, the trial court here was correct that a valid settlement agreement existed, but not because the parties had executed a valid settlement agreement on September 24, 2020. Nevertheless, Thomas' signing of the settlement agreement on September 28, 2020, is of far more consequence in determining whether Katherine and Thomas had executed a valid settlement agreement than the trial court wrongly finding a settlement agreement had occurred on September 24, 2020. So, we conclude that a valid settlement agreement was executed when Thomas performed his part of the settlement agreement when he added his signature to Katherine's signature to the settlement agreement on September 28, 2020. And thus, we affirm the trial court's judgment as right for the wrong reason. *Fawcett Trust v. Oil Producers Inc. of Kansas*, 315 Kan. 259, 288, 507 P.3d 1124 (2022) (affirming trial court as reaching right result for wrong reason).

Next, we will consider Katherine's motion for attorney fess under K.S.A. 59-1504, or in the alternative, under K.S.A. 59-2214. In her motion, Katherine maintains that she "responded to Thomas James' appeal in good faith and with just cause, and is entitled to an award of her fees and expenses, together with compensation for her services, pursuant to K.S.A. 59-1504."

We are guided in our inquiry with this court's decision in In re Estate of Gardiner, 29 Kan. App. 2d 158, 23 P.3d 902 (2001). In Gardiner, the court broke down the language of K.S.A. 59-1504 into four numbered elements that

> "must be met before attorney fees may be recovered: (1) The party who may be allowed the fees by the court must be an heir at law or a beneficiary under a will; (2) the party must have exercised good faith and have had a good cause for incurring such fees; (3) the party must be successful in his or her action; and (4) the action must ultimately benefit the recipients of the estate. When the requirements are met, the court must exercise its discretion to allow fees." 29 Kan. App. 2d at 163.

Three of these four elements were clearly met: (1) Katherine was a beneficiary under the will; (2) she exercised good faith and had good cause for incurring the appellate attorney fees here; and (3) she was successful in her action by showing that a valid settlement agreement was entered into between herself and Thomas.

But there might be a question as to whether the fourth element was met: whether the action ultimately benefited all the recipients of the estate. There is no question that Katherine herself benefited from the action because she was successful in showing that a valid settlement agreement was entered into between herself and Thomas. We note, however, that Thomas challenged in his appeal whether he and Katherine had entered into a valid settlement agreement. But we also note that Thomas did not file a response to Katherine's motion for attorney fees under K.S.A. 59-1504.

As stated earlier, Kansas courts prefer that parties settle their disputes rather than engage in prolonged litigation. In In re Estate of Thompson, our Supreme Court held that "in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it." 226 Kan. at 440. Here, the partially executory settlement agreement between Katherine and Thomas became executed when Thomas signed the settlement agreement on September 28, 2020.

Although Thomas may not have received everything he wanted, he did receive the benefit of those things which led him to sign the settlement agreement on September 28, 2020. The word "settlement" must necessarily recall the notion of compromise.

We find that Katherine's request for $60,065 in appellate attorney fees are reasonable and that these fees should be paid by John R. James' estate under K.S.A. 59-1504.

17

Because we have affirmed the judgment of the trial court, it is not necessary for us to consider the mootness issue.

Affirmed.